IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | | |
|---|---|---|
| Houston Casualty Company, | ) | C.A. No. 3:09-926-CMC |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **OPINION AND ORDER** |
| | ) | **ON CROSS MOTIONS FOR** |
| | ) | **SUMMARY JUDGMENT** |
| St. Paul Fire & Marine Insurance Company, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

Through this action, Plaintiff, Houston Casualty Company ("Houston"), seeks a determination that Defendant, St. Paul Fire & Marine Insurance Company ("St. Paul"), is obligated to pay some portion of a settlement and related defense costs incurred by Houston in defense of an action brought against the parties' mutual insured, McGriff, Seibels, and Williams, Inc. ("McGriff"). The matter is now before the court on cross motions for summary judgment.

Having fully considered the record, the court concludes that the event which gave rise to the underlying litigation is excluded from coverage under St. Paul's policies. The court, therefore, denies Houston's motion and grants St. Paul's motion.

**STANDARD**

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). It is well established that summary judgment should be granted "only when it is clear that there is no dispute concerning either the facts of the controversy or the inferences to be drawn from those facts." *Pulliam Inv. Co. v. Cameo Properties*, 810 F.2d 1282, 1286 (4th Cir. 1987).

The party moving for summary judgment has the burden of showing the absence of a genuine issue of material fact, and the court must view the evidence before it and the inferences to be drawn therefrom in the light most favorable to the nonmoving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). When the nonmoving party has the ultimate burden of proof on an issue, the moving party must identify the parts of the record that demonstrate the nonmoving party lacks sufficient evidence. The nonmoving party must then go beyond the pleadings and designate "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *see also Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

## BACKGROUND

The facts in this matter are not in dispute, although the parties reach differing conclusions as to how St. Paul's policies apply to those facts. The critical facts are as summarized below.

**Underlying Litigation.** This insurance-coverage dispute arises from litigation brought by Manuel Salazar ("Salazar") for injuries he suffered while working on the Lake Murray Backup Dam Project ("Project"). Salazar was seriously injured when a crane near which he was standing came into contact with overhead electrical lines.

Salazar initially brought suit against the owner of the power lines (South Carolina Electric and Gas ("SCE&G"))[1] and the manufacturer of the crane. Salazar Complaint (Dkt. No. 43-8). Roughly one year into the litigation, Salazar added claims against others including Paul C. Rizzo Associates, Inc. (the engineering firm responsible for the Project), Liberty Mutual Fire Insurance Company (an insurer of the Project), and McGriff (the insurance broker for the Project). Salazar

---

[1] SCE&G or its parent company, SCANA Corporation ("SCANA"), is also the owner of the Lake Murray Dam. Because any distinction between the two entities is of no significance to the present motions, the court will refer only to SCE&G in the remainder of this order.

Am. Complaint (Dkt. No. 43-4).

It is the claims against McGriff which give rise to the present dispute. Those claims are based on allegations that McGriff "under[took] a duty to inspect the facility to ensure a reasonably safe environment in which to perform the construction work." Salazar Am. Complaint ¶ 6; *see also id.* ¶ 40 ("McGriff undertook a duty to inspect the facility on a regular basis, and to identify and correct any potential safety problems[.]"); *id.* ¶ 43 ("McGriff contracted with Defendant SCE&G to inspect the facility on a regular basis and to identify for correction any potential safety problems.").

**McGriff's Role in the Project.** McGriff is a large insurance brokerage company located in Birmingham, Alabama. It brokered insurance coverage for the Project in a form referred to as an Owner-Controlled Insurance Program ("OCIP").

As part of the OCIP program, McGriff provided a document titled "Manual of Insurance Procedures of the Saluda Dam Project Owner-Controlled Insurance Program" ("OCIP Manual"). *See* Dkt No. 43-12 at 2 (letter from Gray Culbreath, Esquire ("Culbreath") dated March 24, 2006); Dkt. No. 43-13 at 2 (Culbreath letter dated March 7, 2006).[2] The OCIP Manual bears the McGriff logo on each page and describes the purpose of the OCIP as "to provide an efficient insurance and claim delivery system at the most reasonable cost." *See* OCIP Manual at 2; Dkt. No 43-7 (selected pages of OCIP Manual reflecting logo).

The OCIP Manual includes two provisions which Salazar contended placed part of the

---

[2] Culbreath was hired by Houston or a related entity, HCC Global Financial Products ("HCC Global"), to serve as lead counsel in defending McGriff against Salazar's claims. Over the course of that representation, Culbreath sent a series of letters to McGriff and HCC Global reporting on the status of Salazar's actions and his evaluation of the case. Both sides rely, in part, on Culbreath's letters for the relevant factual background.

3

responsibility for Project safety on McGriff (referred to in the manual as "MSW"):

> GENERAL CONTRACTOR is responsible for the management and administration of the Project Safety Program. Owner's Safety Representative, in conjunction with GENERAL CONTRACTOR *and MSW [McGriff]*, will furnish safety posters, loss and inspection reports and provide overall supervision of the Project Safety effort.
>
> * * *
>
> VII.  PROJECT SAFETY (LOSS CONTROL) PROGRAM
>
> * * *
>
> A Project Safety Program has been established by the General Contractor to conform with industry standards, and to meet the requirements of all Local, State, and Federal stadards, and will be supervised and reviewed by the Owner's Safety Representative *and MSW [McGriff]*.

OCIP Manual at 4,19 (emphasis in italics added).

Despite this language, Edward Copeland ("Copeland"), a McGriff employee involved in coordinating insurance coverage at the Project, denied that McGriff played *any* role in the Project's safety program. Copeland dep. at 11, 88. He, instead, characterized the above-quoted language as "fluff." *Id.* at 88. Nonetheless, he conceded that the OCIP Manual which McGriff provided stated that the project safety program was to be established by the general contractor and "supervised and reviewed by the owner's safety representative and McGriff[.]" Copeland dep. at 93 (agreeing OCIP Manual provided for this duty but stating "we didn't review [the safety program]"); *id.* at 94 (making similar statements as to duty to provide "supervision of the safety program").

Other evidence potentially linking McGriff to a safety role included its somewhat convoluted relationship with Don Seekins ("Seekins") of Project Risk Control. That relationship arose, in part, out of McGriff's agreement to make payments on the Owner's behalf to Seekins in order to facilitate his hiring. Dkt. No. 43-13 at 2 (Culbreath letter explaining McGriff's role in Seekins' employment).

4

On his business cards, Seekins described his role as "Project Safety OCIP Administration." Evidence developed during discovery in the Salazar action supported the conclusion that Seekins' duties included supervision of certain aspects of the safety program including performing various safety inspections. *See* Dkt. No. 43-12 at 1 (Culbreath letter to McGriff dated 3/24/2006). He also prepared "safety inspection reports" relating to these inspections. *Id.* at 2-3. Deposition testimony from various SCE&G employees during discovery in the Salazar action also supported the conclusion that Seekins' job at the Project was safety-related. *Id*. at 2.

Based on this and other evidence, Salazar took the position that Seekins served as the "owner's safety representative" mentioned in the OCIP Manual. He also maintained that, in this role, Seekins was working both on behalf of the Owner and McGriff. *Id.* at 2.

McGriff denied that Seekins was its employee. It asserted, instead, that it was only facilitating Seekins' employment as an accommodation to the Owner, its insurance customer. Seekins, however, believed otherwise and manifested this belief by having McGriff's logo printed on his business cards which, as noted above, described Seekins' role as "Project Safety OCIP Administration." *Id.* at 2-3. McGriff did not authorize the use of its logo on Seekins' cards and was unaware of this use or Seekins' belief that he was a McGriff employee until after the accident giving rise to this insurance dispute. *Id.* at 3; *see also* 43-13 at 2 (counsel's letter discussing assistance McGriff provided Owner in identifying individuals to consider for the position ultimately filled by Seekins as well as in facilitating his employment). This was, nonetheless, evidene a jury could have considered in the Salazar action.

**Houston's Defense of Salazar's Claims.** McGriff tendered the defense of the above litigation to its professional liability carrier, Houston. Houston defended the action beginning on

5

or before July 25, 2005. *See* Dkt. No. 43-9 at 1-2 (March 16, 2006 letter from Drinker Biddle & Reath to McGriff); *id.* at 3-7 (July 25, 2005 letter from HCC Global to McGriff). At least during some portions of this time, the defense was under a reservation of rights.[3] The defense efforts and counsel's related evaluation of the case are summarized in five letters sent to McGriff and HCC Global by defense counsel between January 6, 2006, and April 13, 2006. Dkt. Nos. 43-12, 43-13, 43-14, 43-17, 43-22.

On March 7, 2006, Culbreath, who was hired by HCC Global to serve as McGriff's counsel (*supra* n. 2), reported to both McGriff and HCC Global's claims representatives that the defendants in the Salazar action intended to conduct a joint mock trial on April 11 and 12, 2006. Dkt. No. 43-12 (Culbreath letter to McGriff); Dkt. No. 43-13 (Culbreath letter to HCC Global). After the mock trial, Culbreath reported to HCC Global that "all three jury panels found against McGriff and the other Defendants and awarded substantial damages" ranging from $35 million to $60 million. Dkt. No. 43-17 at 2 (letter dated April 13, 2006). Observations of the deliberations by the mock-trial juries revealed that the "vast majority of the juror comments as to McGriff's case were negative." *Id.* For example, the jurors felt Seekins was not qualified and felt "that McGriff should not have helped to place him on the job site given his lack of qualification[.]" *Id.* The jurors "also believe[d] strongly that the [OCIP] Manual . . . created a duty on the [part] of McGriff to supervise the safety of the job site notwithstanding the obligations of other parties[.]" *Id.* The juries also "rejected the

---

[3] Whether Houston was obligated to defend and indemnify McGriff is not an issue before this court. The court does, however, note that Houston's reservation of rights was apparently based on an exclusion for bodily injury claims. The memoranda and exhibits filed in this case suggest that McGriff challenged Houston's right to rely on this exclusion based primarily on a waiver argument. Whatever the merits of that argument, it was resolved by a settlement between Houston and McGriff.

argument that Don Seekins was not working on behalf of McGriff." *Id.* at 3. Based on his evaluation of the mock trials, Culbreath opined that Salazar had "an 80-90% chance of a verdict against McGriff[.]" *Id.* at 4.

At the time of the mock trial and the above report, a $29 million settlement demand was pending. In light of the substantially larger verdicts in the mock trials, Culbreath advised HCC Global as follows:

> Given the discussions of an equal division among the Defendants to settle the case, the opportunity to settle the case exists within the policy limits. It is imperative that McGriff and [Houston] participate in this global settlement before either the Plaintiff increases his [demand] or the remaining Defendants settle the case without McGriff. If we do not participate in this global settlement, I firmly believe the remaining Defendants would settle out . . . and the Plaintiff would try the case against McGriff. . . . As we have seen from the jury research, . . . if McGriff were to proceed to trial alone, a jury would return a verdict against it far in excess of $29 million dollars settlement demand or McGriff's share of the same. Accordingly, I would ask that you authorize me to enter into settlement negotiations on behalf of McGriff.

*Id.* at 5-6.

The matter proceeded to a May 3, 2006 mediation during which Defendants entered a global settlement, agreeing to pay a total of $20 million to settle all of Salazar's claims. *See* Dkt. No. 43-20.[4] Houston contributed $5 million of this amount on behalf of McGriff. In exchange for this contribution on its behalf, McGriff signed an Agreement and Release. This document included an "assignment of McGriff's remaining rights of recovery against St. Paul in connection with the

---

[4] From the dates on the settlement agreement and related documents, it appears the parties agreed to the settlement terms on May 2, 2006 (the first day set for mediation). Dkt. No. 43-20 at 1. However, the agreement was not fully executed by all parties until August 8, 2006. *Id.* at 11-15. The McGriff-Houston Agreement and Release which contains the assignment of rights was signed by the various parties between August 8, 2006, and August 11, 2006. Dkt. No. 43-18.

Underlying Litigation to [Houston] and Westchester." Dkt. No 43-18 at 1.[5]

**St. Paul's Non-Participation in Defense or Indemnity.** McGriff first sought St. Paul's participation in the Salazar action on or about March 24, 2006. Runkel dep. at 127-28 (Dkt. No. 32-12 at 12). The specific request was that St. Paul "participate in the upcoming mediation." *Id.* at 120. By this point, Houston had been providing a defense for over a year. *See* Dkt. No. 43-12 (Culbreath's March 24, 2006 letter to McGriff "outlining McGriff's liability exposure" and noting that he had "over the past year drafted several status reports outlining these issues."). Moreover, matters were then in their final stages with a mock trial scheduled for April 11-12, 2006, mediation scheduled for May 3, 2006, and trial scheduled for June 5, 2006. Dkt. No. 43-13 at 1 (letter dated March 7, 2006). .

St. Paul declined to participate in mediation based, in part, on the short time between when the request was made and the mediation date and, in part, based on its initial determination that Salazar's claims were not covered under its commercial general liability ("CGL") policy and related Umbrella Excess Liability Policy ("Umbrella Policy"). The coverage determination was based on two endorsements applicable to both policies. The first endorsement excluded coverage of:

- any obligation assumed . . . in connection with an insurance contract . . . ;

- any failure to carry out, or improper carrying out of, any contractual or other duty or obligation in connection with an insurance contract . . . ;

\* \* \*

- the performance or failure to perform insurance professional services.

Dkt. No. 43-16 at 34. "Insurance professional services" was defined to include the following

---

[5] Westchester Fire Insurance Company ("Westchester") was an additional party to the Agreement and Release but does not assert any claims in this action.

relevant services:

> • advising, inspecting, making recommendations, or reporting in the . . . capacity as an insurance agent, broker, company, consultant, or representative;
>
> * * *
>
> • performing any actuarial, adjustment, appraisal, audit, claim, consulting, data processing, engineering, inspection, investigative, or survey service for a fee[.]

*Id.* The second endorsement excluded, *inter alia*, coverage of injuries or "damage that results from the performance of or failure to perform professional services . . . in connection with" a variety of services including "engineering or inspection" work. *Id.* at 35.

St. Paul did not communicate its final decision on coverage to McGriff or Houston until August 24, 2006. Dkt. No. 31-3 at 17 (Runkel dep. at 241). St. Paul's representative, James A. Runkel ("Runkel"), explained that the purpose behind the delay was to obtain advice of counsel as to its decision to deny coverage. Runkel dep. at 121.

During his deposition, Runkel stated that his evaluation of the duty to defend was based solely on the content of Salazar's amended complaint. Runkel dep. at 68. This focus was based on Runkel's belief that the law of the controlling jurisdiction, whether Alabama or South Carolina, required consideration only of the "four corners" of the complaint.[6] *Id.* He conceded, however, that if the applicable law allowed him to look outside of the complaint, and if there was evidence to

---

[6] It appears that South Carolina law governs this insurance dispute. *See* S.C. Code Ann. § 38-61-10 (providing that "contracts of insurance on property, lives, or interests in this State are considered to be made in the state and . . . . are subject to the laws of this State"). The court need not, however, resolve the conflict of law question because the parties concede that the result is the same under either Alabama or South Carolina law.

9

support a denial of liability (*e.g.*, evidence that McGriff was not involved in safety inspections or recommendations), it might have impacted St. Paul's decision whether or not to *defend* the litigation. *Id.* at 77-78 (referring solely to duty to defend).[7]

As to the duty of indemnification, however, Rungel testified the insurer would consider the evidence as developed through discovery, noting, nonetheless, that "if it was absolutely established that McGriff couldn't be found liable, there would be nothing to indemnify." *Id.* at 78 (referring to McGriff's position that it had no responsibility for and played no role in ensuring safety at the Project site).

**DISCUSSION**

**I.   STANDING**

St. Paul argues that Houston lacks standing to pursue its claims either in its own right or as assignee of McGriff. The court disagrees at least as to some aspects of each claim.

**Houston's standing in its own right.** To the extent it seeks recovery of amounts it paid in the settlement, Houston has standing to pursue claims for equitable contribution from St. Paul. *See*,

---

[7] Houston argues that, under either South Carolina or Alabama law, St. Paul erred in failing to look beyond the allegations of the complaint in determining whether it had a duty to defend. Houston is correct that South Carolina cases decided after St. Paul's decision support a limited duty on the part of the insurer to look beyond the allegations of the complaint in determining whether it owes a duty of defense. *City of Hartsville v. South Carolina Mun. Ins. & Risk Financing Fund*, 677 S.E.2d 574, 579 (S.C. 2009) ("Although a determination of an insurer's duty to defend is dependent upon the insured's complaint, an analysis of this duty involves the allegations of the complaint and not the specifically identified causes of action. Moreover, an insurer's duty to defend may arise from facts outside of the complaint that are known to the insurer."); *see also Collins Holding Corp. v. Wausau Underwriters Ins. Co.*, 666 S.E.2d 897, 899 (S.C. 2008) ("In action for a declaratory judgment, the obligation of a liability insurance company to defend and indemnify is determined by the allegations of the complaint. . . . If the facts alleged in the complaint fail to bring a claim within the policy's coverage, the insurer has no duty to defend. . . . In examining the complaint, a court must look beyond the labels describing the acts to the acts themselves which form the basis of the claim against the insurer."). Ultimately, however, this case turns on policy language which clearly excludes coverage regardless of whether one focuses solely on the factual allegations in Salazar's amended complaint or the facts as developed through discovery in that action.

10

*e.g.*, *Nationwide Mut. Ins. Co. v. Hall*, 643 So. 2d 551, 561 (Sup. Ct. Ala. 1994) ("When two or more insurance carriers have primary insurance coverage of the same insurable interest, subject matter, and risk, they share liability in accordance with the proportion that the limits of each policy bear to the total limit of insurance applicable to the loss."); *Lucas v. Garrett*, 41 S.E.2d 212, 215 (S.C. 1947) (quoting out-of-state authority for the same proposition but noting that, for contribution to be required, "it is essential that both policies insure the same interest against the same casualty").[8]

The right of contribution does not, however, extend to any claim for costs of defense. *See*, *e.g.*, *Hartford Accident & Indem. Co. v. South Carolina Ins. Co.*, 166 S.E.2d 762, 765 (S.C. 1969).[9] Neither is Houston a party to the insurance contract with any independent right to seek recovery of defense costs.[10]

For these reasons, the court concludes that Houston has standing in its own right to pursue

---

[8] Houston's first cause of action seeks a declaration that "coverage exists under the St. Paul Policies" and that "St. Paul must pay its share of the settlement, including full reimbursement of all amounts paid by Houston Casualty." Complaint ¶ 21. Although this cause of action is labeled as a "declaratory judgment" claim and seeks greater relief than would be available in a contribution action, it is fairly construed as a claim for equitable contribution for the amounts Houston paid in settlement of the claims against Houston and St. Paul's mutual insured. That said, there are arguments that contribution is not available because the Houston and St. Paul policies do *not* insure "the same interest against the same casualty." To the contrary, the exclusions in the two endorsements to St. Paul's CGL and Umbrella policies largely coincide with the scope of coverage of Houston's policy. The court need not determine whether these differences preclude contribution because, as explained below, the claims at issue in the Salazar action are excluded from coverage under St. Paul's policies.

[9] Houston distinguishes the cases on which St. Paul relies for its standing argument by noting that those cases involve claims for recovery of defense costs. *See* Dkt. No. 52 at 5. In making this distinction, Houston appears to concede that it lacks standing in its own right to pursue a claim for defense costs. McGriff has not, in any event, presented any authority in support of such standing and does not, in fact, appear to seek recovery of defense costs under its first cause of action.

[10] Houston's second cause of action is for breach of contract and refers to two insurance policies issued by St. Paul *to McGriff*. Complaint ¶¶ 22-27. Houston asserts that St. Paul breached those policies, causing damages both to McGriff *and Houston*. *Id.* ¶ 25. Houston does not, however, suggest that it is an insured or beneficiary under either policy.

11

claims for contribution for amounts paid in settlement of the claims against McGriff. It does not, however, have standing in its own right to pursue recovery of defense costs it expended on behalf of McGriff.[11]

**Houston's standing as assignee of McGriff.** St. Paul argues that McGriff's assignment to Houston is ineffective to confer standing on Houston for any purpose because McGriff paid nothing to settle the claims and, consequently, had nothing to assign. The assignment was, however, given, at least in part, in exchange for Houston's agreement to pay the amounts necessary to consummate the settlement. Presumably, that payment had not then been made at the time the assignment was executed. Thus, at the time of the assignment, McGriff still faced potential liability either under the settlement agreement or through trial if the settlement was not consummated. For present purposes, the court presumes this to be a sufficient interest to confer standing on McGriff because McGriff could have pursued a claim for defense or indemnification against St. Paul at the time it executed the release. The court also presumes it to be an interest McGriff could transfer to Houston, which McGriff did for valuable consideration. However, because the court concludes that the claims fail in any event, it declines to make a final determination on this standing issue.[12]

Given the basis for finding standing as to the assigned claims, it follows that this standing

---

[11] Even if Houston was seeking and had standing to pursue a claim for recovery of defense costs (either in its own right or as assignee of McGriff), the facts would not support such a claim. This is because there is no evidence that McGriff ever tendered the defense to St. Paul or otherwise sought St. Paul's participation in the defense effort beyond requesting participation in mediation and settlement. That request was made in late March 2006 and related to a mediation already scheduled for early May 2006. Only a small portion of Houston's defense costs would be attributable to the mediation effort and subsequent settlement-related activities and there is no suggestion that these costs (as opposed to contribution to settlement) would have been reduced by St. Paul's participation.

[12] The rights McGriff assigned might, nonetheless, be without value, given that McGriff never paid any amounts to consummate the settlement. The court need not resolve this issue, however, because it concludes that the underlying claims were not covered under the St. Paul policies.

12

is limited to standing to pursue a claim for some share of the settlement contributed on behalf of McGriff. By contrast, McGriff never paid and was never obligated to pay any fees or costs relating to the defense of the action. Thus, it had no rights to assign with respect to defense costs distinct from any contribution to the settlement.

## II. MERITS

St. Paul argues that it owed no duty to defend or indemnify McGriff against Salazar's claims because the alleged (and potential unalleged) bases of liability fell within unambiguous policy exclusions. The court agrees. It follows that St. Paul has no obligation to contribute to the settlement of claims against McGriff. *See generally B.L.G. Enters., Inc. v. First Fin. Ins. Co.*, 514 S.E.2d 327, 330 (S.C. 1999) ("an insurer has no duty defend an insured where the damage was caused for a reason unambiguously excluded under the policy").

**Claims Pleaded.** The court begins the analysis of whether there is coverage by examining Salazar's amended complaint (the only complaint with claims against McGriff). There, Salazar identified McGriff by noting its role as insurance broker. Salazar Am. Complaint ¶ 5 (Dkt. No. 43-4). In the same sentence, Salazar alleged that McGriff undertook "a duty to inspect the facility to ensure a reasonably safe environment in which to perform the construction work." *Id.* Similarly, in his sole cause of action against McGriff, Salazar alleged that McGriff "undertook a duty to inspect the facility on a regular basis, and to identify and correct any potential safety problems" and "was negligent . . . in failing and refusing to identify and/or correct the safety hazards which existed at the construction site." *Id.* ¶¶ 40, 43.

These allegations rely on a combination of McGriff's role as insurance broker (a role which would not, alone, give rise to liability) and a related role of inspection, identification, and correction of safety issues. The implicit linkage between the two sets of allegations is that McGriff undertook

13

safety-related responsibilities in connection with or as part of its obligation as insurance broker.

So interpreted, the claims as alleged would be excluded from coverage under the first two subparts of St. Paul's "Insurance and Related Work" endorsement which reads, in relevant part, as follows:

> **Insurance and related work.** We won't cover injury or damage or medical expenses for which the protected person may be held liable because of:
>
> • any obligation assumed by any protected person in connection with an insurance contract or treaty; and
>
> • any failure to carry out, or improper carrying out of, any contractual or other duty or obligation in connection with an insurance contract or treaty[.]

Dkt. No. 43-16 at 34.

A third subpart would also bar coverage of the claims as alleged. This subpart excludes coverage for damages resulting from "the performance or failure to perform insurance professional services" which are defined to include:

> • advising, inspecting, making recommendations, or reporting in the protected person's capacity as an insurance agent, broker, company, consultant, or representative;
>
> * * *
>
> • performing any actuarial, adjustment appraisal, audit, claim, consulting, data processing, engineering, inspection, investigative or survey service for a fee[.]

*Id.*

The first bullet point of this definition would bar coverage to the extent Salazar alleged that McGriff was liable because, in its role as insurance broker, it had and failed to fulfill a duty to advise, inspect or make recommendations relating to safety. The second bullet point would bar coverage to the extent Salazar alleged that McGriff was liable due to negligent performance of duties involving consulting, engineering, or inspections relating to safety and received a fee for those

14

services. Given that McGriff was compensated through commissions for its brokerage services and there is no allegation or suggestion in the complaint that McGriff assumed any safety-related duties except in this role, it follows that these allegations fall within the above-quoted exclusions.

The second relevant policy endorsement applies to "appraisers, inspectors or surveyors professional services." This endorsement excludes coverage without connection to McGriff's role as insurance broker (and without allegations of payment of a fee) to the extent Salazar alleged his injuries resulted from McGriff's "performance of or failure to perform professional services . . . . in connection with . . . engineering or inspection" work. Dkt. No. 43-16 at 35. Salazar's allegations that McGriff failed to properly perform inspections and to identify and correct safety problems at the Project site fall within the general categories of "engineering or inspection" work.

There may be interpretations of Salazar's amended complaint which would fall outside of one or more of the subparts of these exclusions. However, no reasonable interpretation of his claims would fall outside all of them or the theories reasonably predicted by Salazar's factual allegations. *See supra* n.7 (discussing *City of Hartsville* and *Collins Holding*). Thus, focusing solely on the allegations of Salazar's amended complaint and the theories reasonably predicted by the complaint, the court finds that Salazar's claims against McGriff were excluded from coverage under St. Paul's policies.

**Facts as Developed Prior to Settlement.** The court has also considered the evidence as developed through discovery and all legal theories reasonably predicted by that evidence. *Id.* This includes consideration of those theories of liability which were suggested as possibilities by the mock trial conducted on April 11-12, 2006.

The results of this mock trial are summarized in a letter written by the attorney Houston retained to conduct McGriff's defense. Dkt. No. 43-17 (Culbreath letter dated April 13, 2006). As

15

explained in this letter, each of the three jury panels held McGriff partially responsible for Salazar's injuries based largely on two considerations: (1) the safety-related duties assigned to McGriff by the OCIP Manual; and (2) McGriff's involvement in facilitating Seekins' employment. *Id.* at 2-3. For the reasons set forth below, both of these potential bases of liability fall within policy exclusions.

Whatever duties McGriff was assigned by the OCIP Manual are clearly "obligations assumed . . . in connection with an insurance contract" because they are found in the manual addressing the parties' respective roles under the "Owner-Controlled Insurance Program" which McGriff brokered. Similarly, any failure by McGriff to perform such duties (properly or at all) would be a "contractual or other duty or obligation in connection with an insurance contract." Thus, any liability imposed based on duties set out in the OCIP Manual would be excluded from coverage under the first two bullet points of the Insurance and Related Work endorsement.[13]

To the extent a jury based liability on a failure by McGriff to properly advise, inspect, make recommendations or report as to some safety-related duty assigned under the OCIP Manual, the duty breached would *also* fall within the third bullet point quoted above ("performance or failure to perform insurance professional services"). This is because the subject duties fall within the list of duties covered by the first definition of "insurance professional services" and because McGriff's obligations under the OCIP Manual would only have been assigned to it in its role "as an insurance agent, broker, company, consultant, or representative." Thus, both subparts of the first definition of "insurance professional services" apply to claims based on such allegations. Notably, no "fee"

---

[13] Two statements found in the OCIP Manual suggest that McGriff was jointly responsible for safety at the Project. As noted above, the OCIP Manual was provided by McGriff and bore McGriff's logo on each page. These facts suggest McGriff not only "provided" the OCIP Manual but was also responsible for its content. In any event, a jury could have reached that conclusion and, as a consequence, construed any ambiguity in the duties assigned by the OCIP Manual against McGriff.

16

need be paid for this definition to apply.[14]

In short, any liability based on duties McGriff assumed through or was assigned by the OCIP Manual would be excluded under at least one if not several subparts of the Insurance and Work Related Endorsement. To the extent Salazar prevailed on such a theory of recovery, his claims would, therefore, be excluded from coverage under St. Paul's policies.

The court, therefore, turns to the second potential basis for imposing liability on McGriff: its connection with or responsibility for Seekins' employment at the site.[15] To the extent Seekins is found to be an SCE&G employee (which McGriff maintained was the case), the evidence supports the conclusion that McGriff facilitated Seekins' hiring including by suggesting possible candidates for the job and advancing payments to Seekins with reimbursement from SCE&G. McGriff's motivation was to assist its large insurance client in fulfilling the client's job site responsibilities (some or all of which are set forth in the OCIP Manual). *See* Dkt. No. 43-12 (Culbreath letter addressing Seekins' hiring and expansion of safety role after he was hired). McGriff did not receive any *added* compensation or fee for this accommodation, although it did receive a commission on the policies it sold. Thus, it is possible to conclude either that this accommodation was a gratuitous action (albeit with an ulterior commercial purpose–accommodating a large client's request) or an action in furtherance of the broader duties for which a fee (in the form of a commission) was paid.

If McGriff were found liable based on its involvement in facilitating Seekins' employment,

---

[14] To the extent a jury found a fee was paid (including through payment of a commission) for duties assigned McGriff under the OCIP Manual, the second definition of "insurance professional services" which covers "consulting . . . engineering, [or] investigative" services, would also apply.

[15] The court recognizes certain difficulties with this theory of liability which may well have caused it to fail either at trial or on appeal. The court considers it, nonetheless, as one of the theories on which the jury might have found McGriff liable.

17

and if the jury concluded this duty was for compensation, then this basis of liability would be excluded under the last bullet point in the definition of "professional insurance services." This is because liability under this theory would be based on McGriff's responsibility for Seekins' role in "performing any . . . consulting, . . . engineering, [or] inspection . . . service for a fee."[16]

Even if the accommodation was found to be gratuitous, the underlying reason for the accommodation was an "obligation assumed . . . *in connection with* an insurance contract." This is because the reason for McGriff's action was to accommodate an insurance customer and because the particular accommodation related, at least in part, to the customer's obligation under the insurance coverage it sold as described in the OCIP Manual.[17]

In addition to the above theory, a jury might have held that Seekins served as McGriff's employee or agent. *See* Dkt. No. 43-23 (Abstance dep. at 28-32) (SCE&G employee stating both that Seekins was an employee of McGriff and that his duties were safety-related). To the extent a jury imposed derivative liability on such a theory, the underlying basis of liability would be Seekins' failure to perform a variety of services falling within the definition of "insurance professional services" (*e.g.,* "advising, inspecting, [or] making recommendations . . . as an insurance . . . consultant" or "performing any . . . consulting . . . engineering, [or] inspection . . . service for a

---

[16] As noted above, the primary source for imposing such safety-related duties is found in the OCIP Manual. That McGriff's representative described the references to McGriff's role in insuring site safety as merely "fluff" does not mean that a jury could not find that the OCIP Manual imposed such duties. On the other hand, such testimony might have convinced a jury that McGriff took a cavalier approach to any safety-related duties which it was obligated to perform.

[17] The requirement that services be provided "for a fee" relates only to one subpart of the definition of "insurance professional services." Thus, it is incorporated to some degree into the third bullet point under the "Insurance and related work" exclusion as quoted above. There is no such requirement incorporated into the first or second bullet point listed above. Neither is it necessary to all subparts of the definition of insurance professional services.

fee").[18] Thus, coverage would be excluded even under a derivative liability theory.

As noted above with respect to the theories predicted by Salazar's complaint, the court concludes that, considering the evidence and potential legal theories developed through the time of settlement, there are theories on which Salazar might have prevailed against McGriff which would have evaded some aspects of the exclusions in the two endorsements. There are, however, no theories on which he might have prevailed which would evade all of them. Consequently, the court concludes that St. Paul owed no duty of defense or indemnification to McGriff, and owes no duty of contribution to Houston.

**CONCLUSION**

For the reasons set forth above, the court concludes that McGriff could only have been held liable for Salazar's injuries under a theory of liability excluded from coverage under the unambiguous language of the endorsements to St. Paul's policies. The court, therefore, grants Defendant's motion for summary judgment and denies Plaintiff's cross-motion. The Clerk of Court shall enter judgment in favor of Defendant.

IT IS SO ORDERED.

       s/ Cameron McGowan Currie
       CAMERON MCGOWAN CURRIE
       UNITED STATES DISTRICT JUDGE

Columbia, South Carolina
April 7, 2010

---

[18] Only the latter exclusion requires payment of a fee. To the extent Seekins is treated as McGriff's employee or agent, the fee would be satisfied by SCE&G's payment of money to McGriff for Seekins' services.